We'll hear argument in our final case on calendar, case 25-284, Romero Romero v. Bondi. I see we have one counsel appearing by video. Mr. Zanfordino, can you hear us all right? I can hear everyone excellently. Can everyone hear me? Great. Thank you. And we'll ask you to mute again and just to stay on video. And we will hear first from Ms. Byer. Good morning. Good morning. Good morning, Your Honors. May it please the Court. Jenna Byer from the Public Defender's Office on behalf of the petitioner, Nectali Romero Romero. I want to acknowledge Jessica Fuentes, Mr. Romero's life partner, Dolores Garcia, his mother, and his daughter, T.R., who are all watching from Los Angeles this morning. I would like to reserve five minutes of my time for rebuttal. Your Honors, at the heart of this appeal is whether our evidence meets the threshold screening standard to warrant reopening of Mr. Romero's torture claim. It clearly does. Since Mr. Romero's last evidentiary hearing in 2020, the Salvadoran government has implemented a state of exception, suspending constitutional rights, and imprisoning tens of thousands of individuals suspected of gang affiliation. Counsel, I want to turn to, if you don't mind, I want to turn to your aggregation argument. And the argument being essentially that the IJ, although they addressed the risk of torture to Romero Romero regarding gangs and government, it did so in its analysis separate from the other analysis of aggregate risk based upon anti-vigil groups, etc. In other words, at the end of the order, it does discuss, the IJ does go on to say that even if we considered this in the aggregate, it's not enough. Is what the IJ said there sufficient as a reasoned opinion such that it can hold or not? And if not, I need you to explain to us why not. Certainly, Your Honor. Well, the original immigration judge's decision was in 2020 and based on the record in 2020. And what we have now is a situation where individuals who have tattoos, who are former gang members like Mr. Romero, who have criminal histories, who are deportees, they are targeted for torture not only by the Salvadoran government, but also by gang members within the prisons. And so the immigration judge's original decision, you know, it's, yes, I would say that it is wrong as a matter of law on the aggregation, but it's sort of washed over by these subsequent board decisions which fail to acknowledge the entirety of the record that Mr. Romero is exactly in the type of category of people who are subjected to pervasive conditions of torture. And the board does not consider the evidence that gang members within the prisons would target Mr. Romero for torture. And so there's a separate error there in the aggregation of risk in the board's decision on reopening. What exactly in the decision on the motion to reopen do you contend was error? Because this has now been going on a while and was sent back and we have a decision that talks, walks through the expert opinions and reaches a conclusion, essentially that it's, you know, it's speculative as to whether your client would face torture in the prisons. And so where do you, where do you want us to find the error here on this, on this ruling? Yes, Judge Bress. So to start with, the board concedes that our evidence under the state of exception is new, that it demonstrates a significant change in conditions, and they say it directly relates to Mr. Romero's fear of torture. And so the narrow issue that we're looking at here, the only dispute is prima facie eligibility for relief. This court has held repeatedly that prima facie is a threshold screening standard. One need not conclusively establish eligibility for relief, and the evidence must be taken as true for purposes of prima facie review. The board failed to apply the prima facie analysis to this evidence for three reasons. First, the board's finding that torture is rare is entirely untethered from the record and the facts. Cristosal, among other leading human rights organizations, have extensively documented the practice of collective torture upon arrival at the prisons. Individuals are forced to kneel on gravel until their knees bleed. Once they enter, beatings are daily fare. There's indiscriminate use of pepper spray. People are being forced to eat food off the floor with their mouths. Counselor, let me ask you. This may seem very callous, and perhaps it's because the law is callous, but the standard is more likely than not. It's 50%, 51%. So that reading these different horrible statements, and as you have just presented them, they are these things happen. They don't say they happen 50% of the time. And if the proof were to be something happens 40% of the time to people like Mr. Romero, that would fail the standard, even if it seems very callous. Am I right on the law? Judge Boggs, you're right. As a matter of someone applying for cat relief in immigration court, yes, they have to meet that likelihood standard of 50%. But that is not the case in a motion to reopen. The standard for a motion to reopen is a reasonable possibility that if they were granted an evidentiary hearing, they could make out cat relief. And here the evidence is overwhelming that torture is widespread. It is pervasive. It is a policy and practice of the Salvadoran government. And on a motion to reopen, the statements supporting the motion must be taken as true. And the board clearly failed to apply that legal standard that this court has held in Judge Mendoza's decision, in Cower, in Salim, in Bassin. All of these decisions say the board is not conducting a credibility determination. It is not getting into the minutia. What we're looking at here is, as a whole, is there a reasonable possibility that this person could make out a claim for torture relief? That standard is clearly met in this case. And if Your Honor wants to talk about the quantitative evidence in the record, I'm happy to discuss that as well. The Department of State reports discusses how the number of prisoners more than doubled within the first few months of the state of exception. El Salvador now has the highest incarceration rate in the world, nearly double that of the United States, with prisons that are 247 percent capacity. So there is mass overcrowding. There are hundreds of documented cases of torture. The number of deaths, even by the agency's own admission, went from 59 deaths in custody to 253 deaths in custody. So a near tripling of the deaths that are in custody. Is that an annual number or a total number, or what's the time frame of those numbers? Absolutely, Your Honor. So that was at AR4 from August of 2022 until July of 2023. And I'm sorry, I misspoke on the second figure. The original number was 59 deaths in custody. The second number was 173 deaths in custody. So that's a near tripling. Okay, so it's an annual figure. Yes. It sounds like it's one year. Okay. Right, absolutely. But what the board does not acknowledge and is willfully blind in its analysis is the repeated language from Cristosal, from Human Rights Watch, from the Department of State itself, that torture is an institutionalized practice dictated from the highest levels of government. There is a recording of a high-level government official, Carlos Marroquin, who tells gang members that he's speaking to, we are torturing people inside of the prisons. We are treating them as dogs. And so, again, on a motion to reopen where we are not being held to the ultimate burden for CAT, that is enough to warrant reopening of this case. I would point, Your Honors, to the second legal error in this case, which is that the board failed to give reasoned consideration to the expert statements about Mr. Romero's unique risk profile. Mr. Romero is not an average individual who would be swept up in the state of exception. There are two experts, Dr. Borman and Dr. Moody, both of whom provide individualized analysis in this case. Dr. Borman writes that Mr. Romero is a poster child for the type of person prioritized under the state of exception, and he's at high risk of torture because of his personal risk factors, including his past gang membership, tattoos, criminal history, status as an Americanized deportee, and family network. And the first BIA decision, the board has already had two opportunities to give reasoned consideration to this evidence. In the first decision, they do not discuss these expert reports at all. Because Borman had an expert report prior at the first hearing, right, 2020, so one can examine his two reports and see how similar they are. They're quite different, Your Honor, because the second report was after the state of exception, which is a permanent – I was not saying they were similar, but one can examine them for similarity or differences. Certainly, Your Honor. And in the board's first decision, they do not discuss or analyze, much less accept as true, the expert's statements, leading to Respondent Attorney General's unopposed motion to remand from this court so that they could give analysis and assessment to this expert evidence. But then on remand, the board again rejected the expert's statements as, quote-unquote, cumulative of evidence that they had already found lacking. But if the expert's statements were the same as country conditions, there would have been no need for expert statements. As this court held in Castillo v. Barr, expert opinions are in and of themselves separate evidence. And second of all, if the expert's statements were cumulative of evidence they had already rejected, there would have been no need for the Attorney General's remand in this case. Again, under this court's clear precedent in Bassin and Cower, statements supporting a motion to reopen must be taken as true. And here, the expert's statements, coupled with the entirely consistent country reports, compel reopening. I see that I have three minutes remaining. I will reserve my time for rebuttal. Okay. Thank you, Ms. Beyer. We'll hear from the Attorney General. Good morning. May it please the Court, Richard Zampanino on behalf of the Attorney General. The board did not abuse its discretion denying Petitioner's motion. The board did not act arbitrarily. It did not act capriciously when it determined that Petitioner had not demonstrated a reasonable likelihood of meeting the 51% threshold if this case were set back to square one. Dating back to Petitioner's first merits hearing before the immigration judge, Petitioner highlighted El Salvador Decree 717. That was enacted three years prior to the immigration judge's first decision in this case. It starts at page 2829, 2829 of the record. Counsel, if you don't mind, can you answer me this question? Why is it a reasoned decision by the immigration judge if they really – it doesn't appear like they really considered the aggregation argument, but just simply made a statement at the end of the order that even in the aggregation, this would not be enough. Why is that? Why should we look at that as a reasoned decision just as a matter of law? Why is that sufficient? Well, Your Honor, the immigration judge recognized the basis of the claim. The immigration judge gave an extemporaneous oral decision, which she attempted to marshal a great deal of evidence that was submitted to her to try and gather what was there. And also, I would point out in the second decision from the immigration judge, which supplemented the first, reiterated that she had evaluated the evidence and even cited to the various documentation submitted by Petitioner. She made clear that she understood in the aggregate that the burden of proof had just not been met. Again, the focus I would point out to Your Honor is there was a bit of a spectrum that went on here in terms of the claim, which may have been tactical, we're not sure. But early in the stages of the claim, Petitioner highlighted the discretionary waiver and, of course, included plenty of documentation and made arguments about the use and abuse of Decree 717, mentioned that government abuses were very well documented. But the immigration judge and the parties, as any review of the transcript will see, focused on the waiver a little bit more. So the immigration judge then, as essentially a catch-all, had reviewed the evidence, reemphasized that in footnote two of her decision on motion for reconsideration, that's page 1941 in footnote two, emphasized that she had considered, once again, the arguments made contesting her denial of CAT protection. The immigration judge continued to note that the evidence was, frankly, to use her word, nuanced, that there was some room there and she just did not find that the evidence in the aggregate or combined met the 51% burden. So the Petitioner's claim throughout from his own counsel was that, quote, government abuses are very well documented. That's at page 2249 to 50. The – I mean, I take your point. I mean, I read the decisions, and I think it's clear that the judge really thought carefully about the – well, it appears that they really delved into it and explained their decision as to the government abuse and coordination. I mean, I get that, but the problem I guess I'm having is the other, which is the aggregate that seems to be sort of an offhanded sort of comment at the end of the order saying, oh, yeah, and the aggregate is also not enough. And as a court of appeals, we have to evaluate if this is a reasoned consideration, and based on that, that's the trouble I'm having, I guess. So I think part of the thing to bear in mind, Your Honor, is, of course, this was an extemporaneous oral decision that has to occur at the end of a long hearing, even if it is done in English. The immigration judge is trying to convey her view of the evidence, and holistically what is recognized is that the immigration judge was just not able to find enough there there as she looked at the case to say, well, you've alleged Decree 717. The El Salvadoran government is targeting not just criminals but suspected gang members. The El Salvador government is attempting to – El Salvador is a very violent place. The government is engaging in both the use and abuse, according to this report about 717. And I – as a whole, I cannot see that your claim, says the immigration judge, meets the requisite burden. To the point of the understanding what the immigration judge was doing, we would also point out again at the second footnote of the second decision, and this case would be the second IJ decision in 1941, the immigration judge again realizes that petitioner has once again said, I want another hearing. You need to – or at least you need to reconsider your denial. And the immigration judge points to various pieces of evidence, which were substantial, submitted at least the first go, to say, I don't see the claim here. And that includes, as the immigration judge mentioned, aggregate. Some of that is, of course, the immigration judge speaking and trying to make clear her view. Can you address the second – the other argument of counsel that goes really to Judge Boggs' question about the level of proof that's required, indicating that it is a prima facie evidence that is required on a motion to reopen? Could you address that point? Sure, Your Honor. So when the board's looking at this, I'm not trying to be flippant. I promise you I'm not. But the Supreme Court matters. And so the Supreme Court tells us that motions are disfavored. You look at them through a prism because you cannot have applicants having essentially just a low threshold that they can get whatever they want if they just allege sufficient arguments. But the reasonable likelihood, you have to bear in mind that it's to prove 51%. I would actually note this court's decision on Fonseca-Fonseca. Recall that the claim that was made out in Fonseca-Fonseca was actually not asylum. It was not even CAT. It was for a form of relief called cancellation of removal. And the hook there for the applicant was to say I'm going to show exceptional, extremely unusual hardship. That's – for instance, asylum is 10%. CAT is 51%. Exceptional, extremely unusual hardship is far more amorphous. What does it mean? You know it when you see it. The board has issued – it used to be big three. Now it's four decisions to sort of guide fact finders to help understand what does it mean to have exceptional, extremely unusual hardship. In this case, we have a far more exacting standard. So when you're showing that reasonable likelihood in Fonseca-Fonseca, the court was saying, all right, well, he has to show exceptional, extremely unusual hardship. That's sort of like drawing a cloud. It could be all sorts of – it comes in many forms. Versus you have to show reasonable likelihood that you hit 51% if you get back to square one. Ms. Beyer would say we did that. We brought forward expert declarations that if credited would show that, and that's why we need to have another round here. So how do you respond? Your Honor, to that I would point to the standard overview, which is abuse of discretion. The board heard, considered, understood the basis of the claim. In fact, the agency has understood it since the first hearing, that petitioner fears action by the El Salvadoran government taken officially against him with the power of the government against him constituting torture. And the board took that into account. So under abuse of discretion, as this court pointed out – sorry, forgive me for the pronunciation, nudge my body – that the board did not merely react. The board could have said, well, you're someone who raped a 12-year-old girl. We're just not going to do – we're going to do whatever. But no, they didn't. They took into account and said, well, let's evaluate these claims, and your experts say this, and these are the documentation. We understand the claim. They gave it reasoned thought. So we can, of course, differ. You say the ball was fair. I say the ball was foul. You say the batter checked his swing. I say he went around. That's not the standard under abuse of discretion. In fact, it's so important to bear in mind with abuse of discretion as well as what Petitioner was trying to prove that this does come down to essentially was the ball fair or foul. And it's – the board gave reasoned consideration to that answer. For all of the thousands of pages submitted, potentially Petitioner could submit one page. If there was a single page that said for people who have convictions of the nature of Petitioner, they are put in a special room. President Bukele has assured everyone he's going to do the following things. Petitioner would have framed that. He wouldn't need 2,000 pages. He could do it with one. But under Petitioner's request of this court, Petitioner is requesting that this court essentially create a near endless cycle of motions. If all it takes is essentially putting out a claim and saying that's good enough, I don't have to prove 51 percent. We agree you don't have to prove 51 percent at the motions level, but you do have to show reasonable likelihood. And the board recognizing and viewing the motion through the prism that the Supreme Court has said that motions are disfavored. We have to be careful of an endless cycle of motion after motion. It's fair to say time will go on. Time is going to march forward. New events are always going to happen. Will President Bukele be reelected? Will a person with a harder line become elected? There will always be something else to happen. And under Petitioner's reading, that's good enough for another motion. But that is at odds with the Supreme Court's caution because the Supreme Court has said you have to be careful of move-ons who can be so creative and fertile enough to come up with reason after reason to have a new motion submitted. I'm sympathetic to that. I think the Petitioner would probably say, well, look, we're talking about a fairly significant development in El Salvador. It's not just kind of business as usual. It's something new. So Petitioner and I might quarrel even more if Decree 717 didn't exist. If, for instance, things were idyllic and then all of a sudden there was a light switch and now there's essentially the government action against suspected gang members. But this has been a spectrum. This has been a sliding scale from the beginning where Petitioner has feared government action or deliberate government action against gang members, suspected gang members, criminal deportees. In fact, at the record we cited starting around 2828, it points out where even the government was receiving criminal history information sharing, sometimes called CHIS, of deportees with criminal records. What is the government's position on the quality of the showing of torture? Is it – are we talking anecdotal evidence or are we talking broader policies that are more trending towards torture across the board? Well, it would have to be something specific to the applicant. Of course you can add in – you can add in and say, well, I have enough anecdote that maybe if I can produce enough anecdote, it will be viewed as data perhaps. But in this case, because it's being reviewed for abuse discretion, the board looked and said we don't see enough there there specific to your case. If there was something, again, specific about Petitioner, Petitioner would frame it. He would laminate that page. It would be right there. But instead the point is that the agency gave it a fair shake. The agency took a look, reviewed the evidence, understood what the basis of the claim is. It did not merely react. It did not have a knee-jerk reaction based on Petitioner's prior history. It took a look, and in this case we think it's unwarranted what Petitioner is doing, which is flat out asking this court not just to remand but to direct the agency to take favorable discretion, to direct this agency to and order the agency to view his motion with favor. Which is a discretionary item. The board actually gave this a fair shake and understood the basis of the claim. It just didn't work out for Petitioner, and not having your motion granted does not mean the board abused its discretion. The board understood the claim. It just saw things a different way. And under abuse of discretion review, we might disagree. In fact, I would again cite, it's in our brief at page 30, but the Namavaji case, there was even a dissenter on that panel that might have viewed things differently. But the point is that the board thought. It didn't just react. And I would, in my dwindling time, just quickly point out the facts of Najmabadi. That was an Iranian woman who had lived in the United States. By the time it was over, I think she was approaching 20 years, she sought asylum, said look at the repressive regime of Iraq, of Iran against women. I'm sufficiently westernized. She loses asylum. Files a motion to reopen and says 9-11-2001 has taken place. Iran and the United States have a great deal of antipathy towards each other. I'm going to be viewed as western. I'm going to be viewed as westernized. I intend, by the way, in my affidavit, I say I'm going back and I'm going to be active on behalf of women and their negative treatment in Iran. And the board saw it a different way. And that was for asylum. That was for a 10% burden. That was not for a cat claim. We don't all have to agree for it to still be not an abuse of discretion. I see my time has just hit the zero. Great. Thank you very much. And we'll hear from Petitioner. Your Honor, Mr. Romero has no desire for an endless cycle of litigation in his case. He's detained. He's separated from his family. What he is asking for is quite minimal. And that is a new hearing based on evidence that the agency has conceded is a significant change that is, quote, directly related to his fear of being tortured by a public actor due to his status as a former gang member. So my friend on the other side talks about this is not a significant change. It's a sliding scale. The board has already agreed with us that this is a fundamental change in circumstances. And what we are asking for is the minimal remedy of a hearing. And I would just like to take a moment to touch on remedy here. Do you agree that that question that you just put of what he's asking for is an abuse of discretion standard? Your Honor, the court reviews for abuse of discretion motions to reopen. But the misapplication of a legal standard, of the prima facie standard in this case, is an abuse of discretion. The board did not accept as true the statement supporting a motion to reopen. And it ignored the mountain of evidence that torture is a pervasive practice within Salvadoran prisons. And so we are asking for this court to remand with specific instructions to grant reopening. The court did this in Mohammed v. Gonzalez, a 2005 decision in which the board essentially had two opportunities to render a considered judgment. And here the board has had both ample time and opportunity to apply the law correctly. It had 17 months to issue its first decision in this case, which Attorney General found to be wanting, declined to defend that decision before this court. And then it had an additional seven months to produce this second decision. And so because the board has already had these two opportunities, we're asking for specific instructions to grant reopening. I would also point the court to the memorandum disposition in Rivera-Trigueros, where the court did the same thing. They said that the evidence under the state of exception shows prima facie eligibility for CAT, and they granted with instructions to reopen, and that is what we're asking for in this case. Unless Your Honors have anything further, I'll rest. We thank both counsel for their presentations this morning. This matter is submitted. That concludes our calendar for the morning, and we'll stand in recess until tomorrow. All rise. Thank you.
judges: Boggs, BRESS, MENDOZA